**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 12-CV-02515-JLK

FANG TIAN

    Plaintiff,

v.

NEWMONT INTERNATIONAL SERVICES LIMITED, a Delaware company

    Defendant.

---

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT, DOC. 25 AND DENYING DEFENDANT'S MOTION TO
STRIKE, DOC. 37

---

Kane, J.

Defendant Newmont International Services Limited ("Newmont") moves under Fed.

R. Civ. P. 56(c) for Summary Judgment in its favor on each of Plaintiff Fang Tian's four

claims against it, Doc. 25.  Also pending is Newmont's Motion to Strike, Doc. 36.   For

the reasons that follow, I GRANT Newmont's Motion as to Ms. Tian's claim for race and

national origin discrimination and DENY the Motion as to the remainder.  Further, for

substantially the same reasons as capably set forth in Ms. Tian's Response to Newmont's

Motion to Strike, Doc. 37, I DENY Newmont's Motion to Strike *in totem*, with the

conceded exception of Exhibits 11 and 31.

## I.    INTRODUCTION

Ms. Tian asserts four claims based on her employment with Newmont as a SCM

Senior Generative and Exploration and Mine Operation Service Analyst ("Service Analyst"[1]) and her separation from Newmont upon the elimination of her position.  Ms. Tian first claims that she was discriminated against due to her race, Asian, and her national origin, Chinese, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000, *et seq*. Specifically, Ms. Tian alleges that discrimination motivated Newmont to treat her disparately in the terms and conditions of her employment, resulted in her being subjected to a hostile work environment, and motivated Newmont's decision to end her employment. Ms. Tian next asserts claims under Colorado common law for promissory estoppel, fraudulent misrepresentation and negligent misrepresentation based on an alleged promise by her manager to sponsor her application for permanent residence status (or a green card).

## II.   JURISDICTION AND VENUE

Because this action arises under federal law, I have subject matter jurisdiction over it per 28 U.S.C. § 1331 and §1343.  Because Newmont transacts business in the State of Colorado, I have personal jurisdiction over it per C.R.S. §13-1-124.  Because the unlawful employment practices alleged by Ms. Tian occurred within the State of Colorado, venue is proper in this judicial district per 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2).

---

[1] There is some squabbling over the appropriate moniker for Ms. Tian's short title.  Her full title as written above is the label used by Newmont in Ms. Tian's Offer Letter of October 9, 2009.  Ms. Tian would prefer that her position be referred to as "Senior Analyst" and states that her prior counsel "erroneously stipulated" to the short title of "Service Analyst" in the Scheduling Order of January 9, 2013.  Because no legal or factual conclusion hinges upon the precise terminology of Ms. Tian's position, I see no reason to upset the designation used in the Scheduling Order and will use the appellation "Service Analyst."

All administrative prerequisites for filing of this suit have been met. On or about January 25, 2012, Ms. Tian timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about June 22, 2012, the EEOC issued a Dismissal and Notice of Right to Sue to Tian on her Charge of Discrimination. Ms. Tian commenced this action within 90 days of receipt of the Dismissal and Notice of Right to Sue.

## III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adamson v. Multi Community Diversified Servs., Inc.,* 514 F.3d 1136, 1145 (10th Cir. 2008). A disputed fact is material if it could affect the outcome of the suit under the governing law. *Adamson,* 514 F.3d at 1145. A factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* The moving party bears the burden of showing that no genuine issue of material fact exists. *Adamson,* 514 F.3d at 1145. Where, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden by showing a lack of evidence for an essential element of the nonmovant's claim. *Id.* In deciding whether the moving party has carried its burden, I may not weigh the evidence and must view the evidence and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *Adamson,* 514 F.3d at 1145. Neither unsupported conclusory allegations nor a mere scintilla of evidence in support of the

nonmovant's position are sufficient to create a genuine dispute of fact. *See Mackenzie v. City and County of Denver,* 414 F.3d 1266, 1273 (10th Cir. 2005); *Lawmaster v. Ward,* 125 F.3d 1341, 1347 (10th Cir. 1997).

## IV.   FACTUAL BACKGROUND

### *Corporate Structure*

Newmont is a large mining company heavily involved in gold production. Newmont's corporate structure includes a Global Supply Chain Management organization.  Global Supply Chain Management supports Newmont's procurement of goods and services. In the Global Supply Chain Management universe, category management includes two broad categories: goods (bulk commodities) and services (labor). The goods categories include bulk commodities such as fuel, nitrates, and other chemicals. The services categories include outsourced labor for drilling and mine operations services. The goods side of Global Supply Chain Management is more mature than the services side and its categories are more clearly defined.

### *The Hiring of Ms. Tian*

Ramsey Musa was hired in June 2009 as Senior Director Services in the Global Supply Chain Management ("SCM") organization to develop a new services category management team. Mr. Musa sought a new at-will employee to fill a newly created Service Analyst position for the supply side of SCM.  This primary role of this position was to support the contract and purchasing functions of Generative Exploration and Mine Operations Services ("GEMOS") by preparing and providing data collection, modeling,

analysis, and reports supporting the service contracting function.  Ms. Tian applied for

and received this job after interviewing with Newmont.  She accepted the job at a

Newmont internal salary grade of 103 and began work on December 14, 2009, reporting

directly to Mr. Musa.

Ms. Tian understood that "employment with Newmont is at-will, which means

that either the employee or Newmont may terminate the relationship at any time, with or

without cause, justification or explanation to the other. The at-will nature of any

Newmont employee's individual employment relationship with Newmont can only be

modified by contract through a written agreement signed by both the employee and either

the Senior Vice-President, Human Resources or the Chief Executive Officer." Ms. Tian

acknowledged her understanding of the at-will employment relationship on at least four

separate occasions, including: (1) the offer letter she signed on October 12, 2009; (2) the

application for employment she completed on October 15, 2009; (3) the New Hire

Orientation Checklist and Employee Agreement she signed on December, 14, 2009 and;

(4) the Newmont Code of Business Ethics and Conduct which she received at the outset

of her employment and was available to her throughout her employment.

*Ms. Tian's Immigration Status*

Ms. Tian is a Chinese citizen and does not hold U.S. Citizenship. When she was

interviewing for her Service Analyst position, she asked Re Essig, a human resources

representative, about Newmont's policy regarding supporting green card applications and

was informed that the decision to sponsor a green card would be made in the future and

would depend on the company's needs and her performance with input from her

supervisor.  At the time Ms. Tian was hired by Newmont, Ms. Tian had an H1-B visa with her former employer. An H1-B visa allows a non-immigrant to work for a U.S. employer for three years with an option to renew the visa for an additional three years for total of six years. Ms. Tian's H1-B visa was successfully transferred to Newmont through November 2012.  A green card is a separate authorization from an H1-B visa.  A green card allows a foreign national to live and work in the U.S. for ten years.  The process of obtaining a green card is lengthier and more complex than that of obtaining an H1-B visa. The average length of time that it takes to obtain a green card is 1.5 years.

*Mr. Reyes, Ms. Tian's Supervisor*

In late 2009, Mr. Musa was also seeking to hire a more senior category manager to manage the service category function. Mr. Musa hired Juan Pablo Reyes into the role of Category Manager II position with a salary grade of 107.  Mr. Reyes began working at Newmont on January 5, 2010 and Ms. Tian reported to Mr. Reyes from January 2010 through her position elimination a year and a half later.  During Ms. Tian's employment, Mr. Reyes supervised her and one other employee, a lower salary grade contracts administrator, Jana Wening.  During 2010 and 2011, Mr. Musa's counterpart on the goods side of the supply chain management organization was Juan Becerra. Three Bulk Commodities Analysts, Kevin Fair, Craig Jacoby and Jillian Carmichael worked in Mr. Becerra's group during 2010 and 2011. Manuel Rocha was an Analyst for Process Equipment during 2010 and 2011.  These analysts did not report to either Mr. Musa or Mr. Reyes.

*Ms. Tian's Performance Reviews*

Mr. Reyes conducted mid-year and year-end performance reviews for and with Ms. Tian during the year and a half that she worked at Newmont.  The reviews use a performance rating assessment rubric having 6 categories for which 6 rankings are available.  The rankings range from a low 1 of "Did Not Achieve Most Results" to a high 6 of "Achieved All and Exceeded Most/All Results."  Ms. Tian's overall scores were consistently in the 3 range.   Her "Relationship" results tended to be among her lower scores (she twice scored a 2 in this area); she never scored above a 4 in any category. While Mr. Reyes's reviews of Ms. Tian included unsatisfactory and minimally satisfactory numbers during her tenure, he also gave her complimentary feedback.

*Facts Relating to Ms. Tian's Allegedly Discriminatory Terms and Conditions of Employment and Hostile Work Environment*

Ms. Tian claims that she was excluded from meetings, travel, and training relating to her job because of her race and national origin. Her factual evidence to support the allegation that she was excluded from meetings consists of a list she compiled, after she had learned of her position elimination, of all of Mr. Reyes's meetings for a period of roughly six months.  A footnote provided by Ms. Tian explains that her list would have been longer, but she only had access to Mr. Reyes's calendar data from the time period her list covers.  She claims she should have been included at every single meeting on Mr. Reyes's calendar during this period.  She does not claim that her non-attendance compromised her ability to do her job in any way or that her performance suffered because she did not attend the meetings.

Mr. Reyes denies that he excluded Ms. Tian from meetings she should have attended.  Ms. Tian does not claim that she never attended meetings and it is undisputed that she attended some.  Ms. Tian claims that Jana Wening, a Caucasian Contracts Supervisor also under Mr. Reyes management, was invited to attend meetings than she was not.  Again, Ms. Tian does not specifically explain why or which meetings that Ms. Wening attended were ones she should have attended to perform her job.

Regarding missed travel opportunities, Ms. Tian focuses mostly on the travel opportunities that colleagues in non-similar positions had.  The only specific travel request Ms. Tian identifies that was not approved was a request made sometime in 2010 to Mr. Reyes asking to travel to Australia.  Mr. Reyes states that he denied the request by explaining to Ms. Tian that there was no business case or value to the company in her going.  Ms. Tian concedes that she traveled twice to Elko, Nevada, where Newmont has its largest mine site.    Similarly, regarding training, Ms. Tian does not identify specific training that she needed to do her job from which she was excluded.

Ms. Tian also alleges under her claim of discriminatory discharge that she was generally isolated and experienced a hostile work environment.  The facts show that Mr. Reyes did not list Ms. Tian as a contact on one out of office email and promoted Ms. Wening during Ms. Tian's tenure to a salary grade 102 position on January 16, 2011 and to a salary grade 103 position effective January 1, 2012.  Ms. Tian claims that Mr. Reyes permitted Ms. Wening to leave 1-1.5 hours early on some days; Mr. Reyes disputes this.

*Green Card Discussions*

On January 13, 2011, Ms. Tian sent an email to Mr. Reyes and Mr. Musa, asking about Newmont's willingness to sponsor her Green Card.  Mr. Reyes responded that same day to both Ms. Tian and Mr. Musa.  The January 13, 2011 email exchange is as follows:

> Ms. Tian to Mr. Reyes and Mr. Musa:
>
> > JP and Ramsey,
> >
> > First, thank you for your leadership always since I joined Newmont in December
> > 2009.  I have enjoyed working with you.
> >
> > My H1B work visa will expire in November 2012.  In order to continue to work at
> > Newmont, the green card needs to start soon.  I would like to know where the company's standing is regarding the application of my green card.
> >
> > Please let me know if we can schedule a meeting to discuss this soon.
> >
> > Thank you.
>
> Mr. Reyes to Ms. Tian:
>
> > Hi Fang,
> >
> > I need to talk with HR to discuss the steps in the process.  We have been exchanging emails and agreed to do this around March.
> >
> > We can discuss more about this upon my arrival next week.
> >
> > Regards,
> > JP.

Mr. Musa received both emails, but did not send an email of his own.  Mr. Reyes explains that he considered and intended his response to mean that he did not have all the

information necessary to let Ms. Tian know about the company's standing but that he

would find out.  Mr. Musa also interpreted Mr. Reyes's response to mean that Mr. Reyes

needed to find out more from human resources.  Mr. Reyes also testified that this

interpretation is consistent with the typical Newmont practice of management deferring

to human resources when it came to employee green card requests. Ms. Tian states that

she believed otherwise.  She considers Mr. Reyes's response a promise to sponsor a green

card.

Between January 13th and March 21st, 2011, Ms. Tian did not speak with any

Newmont employee about a green card and did not seek clarification about what Mr.

Reyes meant by his response email.  On March 21st, 2011, Ms. Tian sent the following

email[2]:

> JP,
>
> Sorry we did not get a chance to talk about my green card application
> before you leave.  I am thinking that it is probably the latest time we should
> start.  Please let me know if I should start with HR now with some of the
> preparation work, when you are in Australia for two weeks.
>
> Thank you.

There was no more written communication concerning Ms. Tian's green card.

Sometime after the March 21st, 2011 email, in late March or early April, Ms. Tian was

concerned about timing and verbally asked Mr. Reyes about her green card.  Ms. Tian

states that Mr. Reyes told her that Newmont would start her green card application in

May 2011. Ms. Tian does not indicate whether she believed the "start" would be

---

[2] The Exhibit indicates that this email was in the same chain of emails as the January 13, 2011 exchange.

internally within Newmont to decide whether her performance and Newmont's businesses needs supported her application with the United States Citizenship and Immigration Services ("USCIS"), the agency that grants green cards, as would be consistent with what Re Essing told her, or whether the "start" would be the start of generating the paperwork necessary to send to the USCIS.  In any event, Mr. Reyes does not remember if he told Ms. Tian this and does not weigh in on what start may mean.

Ms. Tian's concerns about the timing of her application persisted and she again asked Mr. Reyes about timing in late April or early May.  Mr. Reyes generally assured her that the timing was fine.  Ms. Tian states that Mr. Reyes told her that Newmont was going to advertise her job to obtain a labor certificate, a document necessary for the green card application.  Mr. Reyes denies this and states that he never told Ms. Tian that Newmont was "going to go through the labor certification process."

Chloe St. Clair, Senior Mobility Representative, deals with international human resource issues, including immigration and travel.   Ms. St. Clair worked with Ms. Tian on the transfer of her H1-B visa from her former employer to Newmont and on ensuring that she could return to the United States following a personal trip to China.  Ms. Tian asked Ms. St. Clair sometime in early 2011 if anybody had spoken to Ms. St. Clair about a green card for her (Ms. Tian).  Ms. St. Clair remembers that she had "a few," "maybe three" conversations about a green card for Ms. Tian with Mr. Reyes in the first three months of 2011.   Ms. St. Clair does not remember, however, if Mr. Reyes spoke to her about a green card for Ms. Tian before or after Ms. Tian asked her about a green card and thus does not remember what she told Ms. Tian.  When Ms. St. Clair did speak to Mr.

Reyes about Ms. Tian, the conversations were about Ms. Tian's immigration status only; the conversations did not discuss Ms. Tian's job status.

Ms. St. Clair never started the paperwork that the USCIS requires for a green card and was never under the impression that she would be starting it.  Newmont does not have internal policies or customary practices, whether formal or informal, concerning the timing of green card applications or for communicating to an employee whether a green card will be sponsored.  Other than as may be interpreted with regard to Ms. Tian's inquiries of Mr. Reyes, Ms. Tian never asked Ms. St. Clair or anyone else at Newmont if Newmont was going to sponsor her green card.   She relies solely on her communications with Mr. Reyes to support her belief that Newmont had promised to sponsor her green card.

*Ms. Tian's Position Elimination and Aftermath*

There were ongoing discussions among senior supply chain leadership in the spring of 2011 regarding the most effective way to serve changing business needs for the mining and drilling operations service category. A reorganization proposal was conceived that would result in Ms. Tian's position being eliminated and a new salary grade 103 Exploration and Services Category Manager II ("Category Manager II") position being created.  The initial idea to reorganize was made by Mr. Musa, Melanie Miller, Vice President Global Supply Chain Management, and Gerry Glusic, Vice President Supply Chain.

The Category Manager II position is three levels above the Service Analyst position and the two jobs require different skill sets. The Category Manager II is responsible for

negotiating, executing and managing procurement contracts with annual expenditures in the 250 to 350 million dollar range. The essential duties of the Service Category Manager II position were not part of Ms. Tian's job duties as a Service Analyst. In fact, the Category Manager II position took over a significant portion of the exploration drilling work that Mr. Reyes had been performing in his Category Manager III role so that he could take on other responsibilities. While some of the Service Analyst's analytic services duties were transferred to the Category Manager II position, these duties were not the principal duties of a Category Manager II.

In October 2011, Newmont hired Michael J. Morgan to fulfill the new Category Manager II role. Mr. Morgan, a native of Peru with permanent resident status in the United States, has an undergraduate degree in Business Administration from Universidad del Pacifico in Lima, Peru, and a Master of Business Administration from the University of Texas at Austin. His experience included the position as General Manager of a rice mill in Peru, and leading a purchasing team in developing and implementing a $550 million dollar worldwide strategy for sourcing and supplier network capability of food and beverages and distribution services. His duties included developing negotiating strategies for third-party logistic suppliers and leading a team of six commodity managers.

During 2011, Newmont had a Severance Committee comprised of upper level employees primarily in the human resources department that reviewed business unit proposals to eliminate positions. In June 2011, Mr. Musa and Mr. Reyes prepared a presentation of the proposal to eliminate the Service Analyst position and to create the

13

new Category Manager II position, which Mr. Miller approved, and the Severance

Committee approved it on approximately June 28, 2001.  Ms. Tian does not allege bias

on the part of the Severance Committee members.

On July 8, 2011, Ms. Tian was notified by Mr. Reyes and two human resources

representatives that her position was being eliminated because of a change in skill sets

needed and was provided with a severance pay package.  Ms. Tian was told her position

elimination was not because of any poor performance on her part and Ms. Tian does not

believe her position was terminated because she performed poorly in fact or in

Newmont's perception..  In addition to the offer of a severance pay package, in

consideration of her immigration status, Newmont provided Ms. Tian with approximately

three months' notice of the decision to eliminate her position so that she could engage in

job search activities while continuing her employment with Newmont. Therefore, Ms.

Tian was informed that she would remain employed by Newmont through September 30,

2011.

The timing is unclear but either Ms. Tian went in to see Mr. Reyes privately on July

8, 2011 after she learned of her position elimination because she "want[ed] to ask him the

reason why [Newmont] did this" or during the meeting with the other two HR

representatives also present when she learned of the elimination she asked him the same.

Mr. Reyes told her that Newmont needed a different skill-set and was restructuring SCM

to accommodate that need.  Ms. Tian asked how Newmont could eliminate her position in

light of what she understood was a previously existing promise by Newmont to sponsor

her green card and Mr. Reyes did not respond.  Mr. Reyes does not remember if Ms. Tian mentioned her green card on July 8, 2011.

On September 8, 2011, Ms. Tian told Mr. Reyes that she was not going to take her severance pay and that she was suing Newmont "because of what [Mr. Reyes] did to [Ms. Tian]." Mr. Reyes replied, "Is that because I agreed to sponsor your Green Card?"  Ms. Tian concedes that a promise of a green card is not the same as a promise of continued employment.

Ms. Tian did not call Newmont's compliance telephone hotline, seek assistance from human resources, or review Newmont's Code of Business Ethics and Conduct during the three month period from when she learned that her position was being eliminated to when elimination became effective. She did not try to find out if there was an internal avenue where she could complain about discrimination and instead started collecting information that she believed would help her meet her burden of proof as plaintiff in an employment discrimination case.   For example, it was after Ms. Tian learned that her position had been eliminated that she looked at Mr. Reyes's calendar as described above to make a list of meetings from which she claims she was excluded.  She claims all of Mr. Reyes's meetings for a certain period were related to her job and that she should have been included at every one.  Also during this time, Ms. Tian applied internally for a business analyst position and a finance analyst position.  She was not selected for either position but does not believe that there was bias in the decision not to offer her those positions.

V.   DISCUSSION

A.  Discriminatory Discharge

Title VII provides that it is an unlawful employment practice to "discharge any individual," or to "otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment," on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1).  Ms. Tian's claim under Title VII encompasses theories of both discriminatory discharge and discriminatory terms and conditions/hostile work environment.  This section addresses the discharge theory and the following section, Section IV.B, addresses the terms and conditions /hostile work environment theories.

Ms. Tian's Title VII discharge claim is based solely on the alleged discriminatory elimination of her Service Analyst position. "Ms. Tian makes no claim for a failure to promote to the Manager position, nor does she make any claim for non-selection to any of the positions for which she was qualified in her final months of employment with Newmont." Pl.'s Resp.  at 29. Accordingly, the dispositive issue is whether the elimination of the Service Analyst position and corresponding creation of the Category Manager II position was pretext for discrimination or a lawful, non-discriminatory company restructuring.  "[E]mployers have the right to restructure jobs and job responsibilities, but they cannot use that process to implement discriminatory objective." *Garcia v. Pueblo Country Club,* 299 F.3d 1233 (10th Cir.2002)(quoting *Quaratino v. Tiffany & Co.,* 71 F.3d58, 65 (2d Cir.1995)).

Applying the *McDonnell Douglas* framework to Ms. Tian's discharge claim requires that she satisfy her burden of proving a *prima facie* case by showing that she: (1)

belongs to a protected class; (2) was qualified for her position; (3) was discharged despite her qualifications; and (4) was terminated "under circumstances which give rise to an inference of unlawful discrimination." *Swackhammer v. Sprint/United Management Co.*, 493 F. 3d 1160, 1166 (10th Cir. 2007).  Assuming Ms. Tian satisfies this "light burden," Newmont must articulate a legitimate non-discriminatory reason for her termination. *Id*[3]. Newmont explains that Ms. Tian's Senior Analyst position was eliminated due to changing business needs in the Supply Chain department.

Specifically, Newmont states that the decision to reorganize was brought on by the high price of gold and the increasing cost of outsourced labor. The steep price of gold created a need to move projects quickly to completion to capitalize on the price in a volatile market. The increasing cost of outsourced labor created a need to timely secure resources necessary to move projects quickly to completion. Newmont sought to accommodate these conditions with a strategy that would focus on a few bigger projects with a small number of large vendors.   To implement this strategy, Newmont decided to outsource in greater part the construction of mines to Engineering, Procurement and Construction Management (EPCM)[4] vendors. The change in direction involved specific projects that needed a specific kind of contract labor referred to as EPCM contract labor. The role of the Service Analyst to analyze market trends to find ways to reduce labor costs was not as important in this climate.  As this reason of changing business needs is

---

[3] While Newmont's argument on this issue does not explicitly concede that Ms. Tian has met her prima facie burden, it does not offer argument to the contrary and proceeds on the assumption that Ms. Tian is able to meet the burden. Taking the facts most favorably to Ms. Tian, I will assume without deciding for purposes of this Order's analysis that she has satisfied her burden.
[4] EPCM is an industry acronym used to label outsourced companies that help build new mines.

not "facially non-discriminatory," it satisfies Newmont's burden of articulating a

legitimate, non-discriminatory reason for its decision. *Stinnett v. Safeway, Inc.*, 337 F.3d

1213, 1218 (10th Cir.2003).

   After an employer presents a legitimate, non-discriminatory reason for its conduct, the

burden shifts back to the plaintiff to demonstrate the reason is "a pretext for its

discriminatory intentions." *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1264

(10th Cir.2007).  Ms. Tian may show pretext in variety of ways.  *Kendrick v. Penske*

*Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir.2000).

> Pretext can be shown by such weaknesses, implausibilities,
>
> inconsistencies, incoherence, or contradictions in the employer's
>
> proffered legitimate reasons for its action that a reasonable fact
>
> finder could rationally find them unworthy of credence and hence
>
> infer that the employer did not act for the asserted non-
>
> discriminatory reasons.

*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1324 (10th Cir.1997)

   Here, Ms. Tian attempts to cast doubt upon Newmont's stated reason for her

discharge by dwelling upon the fact that cotemporaneous with her position's elimination

was the creation of the new Category Manger II position and claiming that the two

positions are essentially one and the same.  Relying on the Tenth Circuit's legal analysis

in *Garcia*, Ms. Tian correctly states that the material facts speaking to whether a position

elimination occurred in the face of a new position include "actual changes in

responsibility and status, not just titles, citing *Hooks v. Diamond Crystal Specialty Foods*,

997 F.2d 793, 802 (10th Cir. 1993), *overruled on other grounds by Buchanan v. Sherrill*, 51 F.3d 227, 229 (10th Cir.1995).; whether the responsibilities of the old position still constituted a single, distinct position, citing *Furr v. Seagate Technologies*, 82 F.3d 980, 988 (10th Cir. 1996*)*; and, whether the new position encompassed duties that had not been part of the old position, citing *Brown v. McLean*, 159 F.3d 898, 903 (4th Cir. 1998).

In *Garcia*, the defendant eliminated plaintiff's position of "Grounds Maintenance Superintendent" and created the new position of "Golf Course Superintendent."   The defendant claimed that the new position was a distinct position because, *inter alia*, it involved the operation of a new sprinkler system and had a new written job description that indicated upgraded responsibilities and knowledge requirements, which were reflected in an increased salary. *Id.* at 1237.  The district court relied on the salary differential and the purported change in tasks as specified in the job description to grant summary judgment in favor of the defendant.  *Id.* at 1241.

The Tenth Circuit found testimony in the record, however, from both the plaintiff and Defendant's Club Manager that indicated that the plaintiff was qualified to perform all of the tasks of the nominally new position and that the tasks of the two jobs did not materially differ. *Id.* at 1237, 1239.  Additionally, there was no evidence to suggest that the level of responsibility differed between the two positions.  *Id.* Because there was sufficient evidence in the record to raise a genuine issue of fact as to whether the defendant eliminated the plaintiff's position under circumstances giving rise to an inference of discrimination, the Tenth Circuit reversed.  Unlike the plaintiff in *Garcia*, Ms. Tian presents no evidence that Newmont believed her to be qualified to perform the

19

duties of the Category Manager II position, that is, to handle complex, sophisticated negotiation.[5]

Furthermore, it is not possible that the "responsibilities of the old position still constitute[] a single, distinct position," because the old position's primary responsibility of analytics is not the primary responsibility of Category Manager II position, which is to negotiate contracts with annual expenditures in the 250 to 350 million dollar range. Additionally, because contract negotiation of that scale was not a part of the Service Analyst position, the "new position encompass[es] duties that had not been part of the old position. " Indeed, Ms. Tian's Response admits that the Service Analyst Position and the Category Manager II positions "require different skill sets" and that she only participated in a single contract negotiation during her tenure at Newmont.

Because the undisputed facts make plain that the Category Manager II position was a wholly new contractual arrangement involving essential duties that were not part of the Service Analyst duties and that the Service Analyst duties did not continue to exist as a distinct position, Ms. Tian's discriminatory discharge claim fails as a matter of law.

B.  Discriminatory Terms and Conditions/Hostile Work Environment

---

[5] Similarly, there is also no evidence that Newmont neglected to ascertain whether she had these qualifications. Accordingly, Ms. Tian's citation to *Benson v. Tocco, Inc.*, 113 F.3d 1203, 1211-12 (11th Cir. 1997) is inapposite. In *Benson,* the employer allegedly eliminated the plaintiff's human resources position and created a new job that required both administrative and clerical skills. The plaintiff alleged that his position was not meaningfully different from the new job and that the purported restructuring was a pretext for discrimination. The plaintiff presented evidence that he could perform the tasks required in the new position, with the possible exception of computer skills. Before the introduction of the new job, however, the employer had no reason to evaluate plaintiff's computer skills because none were required in his previous position. Because the employer hired an applicant with no more clerical skills than plaintiff and because the employer failed to investigate whether the plaintiff "might have had the necessary skills to adapt to [the] restructured ... position," the court determined that the district court's grant of summary judgment on this issue was in error. *See Benson,* 113 F.3d at 1211–12. Here, Newmont was aware of Ms. Tian's limited negotiation experience.

Ms. Tian claims that she was discriminated against in the terms and conditions of her employment in that she was allegedly denied the opportunity to attend meetings, to engage in job related travel, and to attend off-site training.  She does not provide sufficient evidence to support this theory.  First, with minimal exception as outlined below, Ms. Tian fails to identify specific travel, training or meetings from which she was allegedly excluded.  Second, she fails to demonstrate how that the alleged discrimination in the terms and conditions of her employment resulted in an adverse employment action.

Ms. Tian states with particularity only one travel request that was denied—a request to travel to Australia in 2010.  Mr. Reyes testified that there was no business reason for this trip. Ex. 7, Reyes Dep., at 32:19-33:10.  While Ms. Tian explains how generally beneficially the travel might have been, she does not argue that she needed to visit Australia to perform her job.  Similarly, while Ms. Tian expounds on the benefits of outside training and the training provided to other employees who were not working on the Supply side, she does not identify any training she sought that was necessary to perform her job that was denied.  Rather, Ms. Tian concedes that she attended a cost modeling training and that Mr. Reyes approved a Microsoft Office training.[6]

In her final performance review, Ms. Tian wrote the following comment about herself under the heading "Innovation and Learning Results": "* Increased personal effectiveness by continuously learning new tools and courses. Looking for new learning

---

[6] Ms. Tian did not undergo this training and pitches her non-participation as the result of Mr. Reyes discouraging her from doing so.  The reality is more nuanced.  Ms. Tian sent Mr. Reyes a one line email that read: "JP—I am attending the May 17 Word and Excel training, whole day."  Mr. Reyes responded with the following two lines: "Ok, but do you think you need it? I think it is only intermediate MS word…" Ex. 12, p.1.  The training was only for Microsoft Word. *Id.* at p.2

opportunities to become a comprehensive expert, such as mining operations or sourcing in China." Ex. O.  Ms. Tian attempts to use this general desire to become more knowledgeable about her industry and one of her company's sourcing countries to assert that she made a specific request for outside training.   I find the record support not at all a "specific" request.  As for her alleged exclusion at meetings, Ms. Tian presents a list she compiled by copying every single meeting Mr. Reyes had on his calendar for a certain period and claims that she was excluded from every one.  Mr. Reyes had 82 meetings on his calendar during the relevant period.  Providing a copy of Mr. Reyes calendar is simply insufficient as a matter of law to identify specific meetings necessary to perform her job from which Ms. Tian was excluded.

Even if Ms. Tian could elucidate specific training, travel, or meetings that she was excluded from, she has not shown that the alleged exclusion would rise to the level of an actionable adverse employment action. "To be an actionable "adverse employment action" for purposes of a discrimination claim, an action must be one that entails 'a significant change in employment status, such as . . . reassignment with significantly different responsibilities or a decision causing a significant change in benefits.'" *Ruprecht v. Level III Communications*, 2012 U.S. Dist. LEXIS 25828 * 12 (D. Colo.February 29, 2012*), quoting Robinson v. Cavalry Portfolio Services*, LLC, 365 Fed.Appx. 104, 114 (10th Cir. 2010) (unpublished), *citing Haynes v. Level 3 Communications*, LLC, 456 F.3d 1215, 1222 (10th Cir. 2006).  In *Luchaco v. Colorado State Patrol*, 2010 U.S. Dist. LEXIS 89462 * 6 (D. Colo. 2010), the plaintiff's Title VII gender discrimination claim was dismissed. It was undisputed that the plaintiff was

denied training that a male employee received.  *Id*. at *8. The court held, however, that the denial of training that might have been generally beneficial was not an adverse employment action because it did not impact the plaintiff's job duties, pay or opportunity to be promoted or transferred and that plaintiff therefore failed to meet her burden of stating a prima facie case of discrimination. *See also Belgasem v. Water Pik Technologies, Inc.*, 457 F. Supp. 2d 1205, 1215 (D.Colo.1996)(failure to link a training denial to a lack of promotion results in failure to show adverse employment action).

Similarly, allegations concerning a lack of travel that are not accompanied by allegations of negative consequences resulting from such lack of travel are also insufficient as a matter of law to support a Title VIII claim.  *See Nettle v. Cent. Okla. Am. Indian Health*, 334 F. App'x 914, 927 (10th Cir. 2009) (not permitting attendance at external events does not represent a significant change in employment status); *Otero v. New Mexico Corr. Dep't*, 640 F. Supp. 2d 1346, 1355-56 (D.N.M. 2009) (holding that denial of plaintiff's request to attend annual meetings is not an adverse employment action); *Vitt v. City of Cincinnati*, 250 F. Supp. 2d 885, 892 (S.D. Ohio 2002) (noting dearth of case authority to support position that denial of computer training and seminar attendance constitutes an adverse employment action).

Nowhere does Ms. Tian assert that any of her alleged opportunity denials resulted in her earning less benefits or salary or having reduced chances of promotion or transfer. Nowhere does Ms. Tian maintain that her alleged denial of opportunities in any way impacted her ability to do her job.  In fact, Ms. Tian expressly states that she "does not assert that the discrimination with regard to meetings, travel and training led to a failure

to meet performance standards." Absent some significant and detrimental change in Ms. Tian's employment status that flows from her alleged denial of travel, training, and meeting opportunities, Ms. Tian's terms and conditions theory of Title VII discrimination fails.

Finally, while neither party provides analysis concerning Ms. Tian's alleged hostile work environment, this theory nevertheless fares no better than Ms. Tian's terms and conditions approach. "Title VII does not establish a general civility code for the workplace." *Morris v. City of Colo. Springs*, 666 F.3d 654, 663–64 (10th Cir.2012) (internal quotes and citations omitted). "To survive summary judgment on a claim alleging a racially hostile work environment, [the plaintiff] must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that the victim "was targeted for harassment because of [her] race or national origin." *Id.* (brackets and internal quotation marks omitted). Quite simply, being omitted from an out-of-office auto reply email and observing a co-worker leave early do not a hostile environment make.

## C.  Promissory Estoppel

Ms. Tian asserts Colorado common law claims for promissory estoppel, fraudulent and negligent misrepresentation based on the alleged promise by Mr. Reyes to support Ms. Tian's application for a green card. Newmont argues that these claims fail on two grounds. First, Newmont contends that the alleged promise is not sufficiently specific to

disclose promissory intent by Newmont.  Second, Newmont argues that even if the

promise or representation is sufficiently specific, it did not modify the parties' at-will

employment relationship because such was subject to modification only by a written

agreement signed by a Newmont executive and no written, signed modification exists.

While Newmont misses the mark on the issue of specificity, it is correct on the issue of

at-will modification based on Ms. Tian's admission that she did not believe the promise

changed the at-will relationship. *See* Ex. B, *Tian Dep.* at 154:7-12,

 ("A promise of a Green Card. No it's not a promise of keeping me employed." ) Because

Ms. Tian's promissory estoppel claim can exist outside of the at-will modification theory,

however, it survives summary judgment.

Courts applying Colorado law employ the following standard to determine

whether a promise modifies the at-will relationship:

> Whether an alleged promise is claimed to be part of an express
> contract or is asserted as the basis for the application of promissory
> estoppel, it must be sufficiently specific so that the judiciary can
> understand the obligation assumed and enforce the promise
> according to its terms.
>
> Thus, in order to constitute an enforceable promise, a statement by
> the employer must meet two requirements. It must disclose a
> promissory intent or be one that the employee could reasonably
> conclude constituted a commitment by the employer.

*Osornio v. T-Mobile, USA, Inc*., 2006 U.S. App. LEXIS 14298 * 5 (10th Cir. 2006),

*quoting Hoyt v. Target Stores*, 981 P.2d 188, 194 (Colo. Ct. App. 1998).  Mr. Reyes

stated in his deposition that he said to Ms. Tian "Is that because I agreed to sponsor your

Green Card?" when they discussed Ms. Tian taking legal action against Newmont.

Viewing the facts in the light most favorable to Ms. Tian, I cannot say as a matter of law that it was unreasonable for Ms. Tian to have concluded that Mr. Reyes was making a commitment to sponsoring her green card.  Indeed, Newmont concedes that the email Ms. Tian relies upon to demonstrate the existence of a promise is "ambiguous."   Because the specificity of the promise and reasonableness of Ms. Tian's reliance upon it is disputed, the matter may not be disposed of on summary judgment on the sole ground of lack of specificity.  Instead, the theory of a specific, enforceable promise as it might modify an at-will relationship is here inappropriate for the separate reason of Ms. Tian's admission that she did not believe the promise to modify her at-will agreement.  That admission prevents her from using the doctrine of promissory estoppel to support a breach of implied contract claim relating to her discharge.  Accordingly, she may not (and indeed has not attempted) to use the doctrine of promissory estoppel to support a breach of implied contract claim relating to her discharge.  Insofar as Newmont seeks summary judgment on the limited question of whether the alleged promise modified the at-will relationship, it is granted.

Newmont's tireless repetition of the undisputed fact that Ms. Tian's employment relationship with Newmont was at-will, however, seems to suggest that Newmont interprets Ms. Tian's promissory estoppel claim as *only* an implied contractual claim related to her position elimination.  Ms. Tian does not assert, however, that Newmont's alleged green card promise prevented it from terminating her at any time for any legal reason.  Ms.Tian's promissory estoppel claim does not seek damages for an alleged wrongful termination of the employment relationship.  Instead, Ms. Tian's promissory

estoppel claim seeks damages for Newmont's alleged breach of a separate and distinct agreement – specifically, Newmont's alleged agreement to sponsor her green card application.  While it is true that the green card promise is "clearly within the context of the employment relationship," it is not "inextricably linked to her employment with [Newmont] as her sponsor, and to [Newmont]'s right to terminate her employment at any time."

*DerKevorkian v. Lionbridge Technologies, Inc.,* 2006 WL 197320 at \*4 (D.Colo.2006).

Colorado has adopted the promissory estoppel doctrine as articulated in the Restatement (2nd) of Contracts, Sec. 90. *Nelson v. Elway*, 908 P.2d 102, 110 (Colo. 1995).  The doctrine provides relief to those harmed because they relied on another's promises, even without an enforceable contract.  *Vigoda v. Denver Urban Renewal Authority*, 646 P.2d 900, 905 (Colo. 1982). The elements of a claim for promissory estoppel are: (1) a promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee; (2) action or forbearance induced by that promise; and, (3) the existence of circumstances such that injustice can be avoided only by enforcement of the promise. *Cherokee Metro District v. Simpson*, 148 P.3d 142, 151 (Colo. 2006).

Ms. Tian alleges with factual support the existence of the specific promise that Newmont would sponsor her green card; that she reasonably believed that Newmont would take such action; that such promise was made with the reasonable expectation that it would induce her to act; that she reasonably relied on Newmont's promise to her detriment; and that such reliance has caused her damages. "Promises which are ancillary

to an otherwise at-will employment arrangement, such as termination procedures

contained in employee manuals, may support a claim for promissory estoppel." *Pickell v.*

*Arizona Components Co.,* 902 P.2d 392, 395 (Colo. App. 1994), *rev'd on other grounds*,

931 P.2d. 1184 (Colo. 1997).  Because there are genuine disputes concerning the

reasonableness of elements of Ms. Tian's promissory estoppel claim-insofar as I interpret

it to be a distinct claim from her discharge from Newmont—I DENY Newmont's motion

as to Ms. Tian's claim for promissory estoppel

### D.  Fraudulent and Negligent Misrepresentation Claims

"To establish fraud, the plaintiff must show the defendant made a false

representation of a material fact, knowing that representation to be false; that the person

to whom the representation was made was ignorant of the falsity; that the representation

was made with the intention that it be acted upon; and, that the reliance resulted in

damage to the plaintiff." *Coors v. Sec. Life of Denver Ins. Co*., 112 P.3d 59, 66

(Colo.2005).

Fraud requires more than the mere nonperformance of a promise or the failure to

fulfill an agreement to do something at a future time. *State Bank v. States*, 723 P.2d 159,

160 (Colo.App.1986). Unless the speaker making the representations deliberately

falsified his or her intention to induce reliance, statements of future events are not

actionable. *See Brody v. Bock*, 897 P.2d 769, 776 (Colo.1995). "A promise concerning a

future act, when coupled with a present intention not to fulfill the promise, can be a

misrepresentation which is actionable as fraud." *Stalos v. Booras*, 34 Colo.App. 252,

255–56, 528 P.2d 254, 256 (1974); *see Kinsey v. Preeson,* 746 P.2d 542 (Colo.1987).

Such promises are actionable only where there is proof that the defendant had the present intention not to fulfill the promise. *See Kinsey, supra; Stalos, supra.*

Regarding negligent misrepresentation, Colorado law has adopted the theory as defined in the Restatement (Second) of Torts § 552(1). *See, e.g., Robinson v. Poudre Valley Federal Credit Union*, 654 P.2d 861 (Colo.App.); *First National Bank in Lamar v. Collins*, 616 P.2d 154 (Colo.App.). The Restatement states that

> "[o]ne who, in the course of his business, ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

Newmont's argument against Ms. Tian's fraudulent and negligent misrepresentation claims is not well developed.  Instead of addressing the elements of the claims, Newmont states that her claims must fail because they do not defeat her at-will employment agreement.  Newmont does not, however, argue or provide authority for the idea that the claims cannot exist outside of the employment agreement.  Given Newmont's near non-treatment of the issue and viewing the facts in the light most favorable to Ms. Tian, I conclude that summary judgment on these claims must be DENIED.

## VI.   CONCLUSION

Based on the foregoing, I GRANT Newmont's Motion, Doc. 25, as to Ms. Tian's

claim for race and national origin discrimination and DENY the Motion as to the

remainder.  Further, I DENY Newmont's Motion to Strike, Doc. 37, *in totem*, with the

conceded exception of Exhibits 11 and 31.


DATED:       September 18, 2014              BY THE COURT:

                                             **_s/John L. Kane_**
                                             John L. Kane, U.S. Senior District Judge